UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA

      - v. -

DARCY WEDD, FRASER THOMPSON,
CHRISTOPHER GOFF, MICHAEL PEARSE,
YONGCHAO LIU a/k/a "Kevin Liu," JASON
LEE, and EUGENI TSVETNENKO,

      Defendants.
------------------------------------------------------------ X

15 CR 616 (KBF)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
CHRISTOPHER GOFF'S MOTION FOR SEVERANCE**

---

July 10, 2017

Simon & Partners LLP
550 Fifth Avenue
31st Floor
New York, New York 10176
(212) 332-8900

*Attorneys for Defendant
Christopher Goff*

**TABLE OF CONTENTS**

**INTRODUCTION** …………………………………………………………...  1

**ARGUMENT** ………………………………………………………………  2

SEVERANCE IS WARRANTED PURSUANT TO RULE 14 OF THE FEDERAL
RULES OF CRIMINAL PROCEDURE AS A JOINT TRIAL WILL
SUBSTANTIALLY PREJUDE DEFENDANT GOFF AND FAIL TO SERVE
THE INTERESTS OF JUSIDICIAL EFFICIENCY AND ECONOMY ………….  3

**CONCLUSION** ………………………………………………………………  10

# TABLE OF AUTHORITIES

**CASES**

*Bruton v. United States,* 391 U.S. 123 (1968) ……………………………………….  2, 10

*Kotteakos v. United States,* 328 U.S. 750 (1946) ……..…………………………….. 6

*United States v. Branker,* 395 F.2d 881 (2d Cir. 1968) ……………………………... 4

*United States v. Feng Ling Liu,* 2014 U.S. Dist. Lexis 31588
(S.D.N.Y. Mar. 7, 2014) …………………………………………………………….. 6

*United States v. Gallo,* 668 F. Supp. 736 (E.D.N.Y. 1987) ………………………….  2, 3, 10

*United States v. Kahaner,* 203 F. Supp. 78 (S.D.N.Y. 1962) ……………………….. 3

*United States v. Kelly,* 349 F.2d 720 (2d Cir. 1965) ………………………………… 4

*United States v. Praetorius,* 462 F. Supp. 924 (E.D.N.Y. 1978) ……………………. 10

*United States v. Salameh,* 152 F.3d 88 (2d Cir. 1998) ……………………………… 6

*Zafiro v. United States,* 506 U.S. 534 (1993) ……………………………………….. 2, 6


**RULES**

Fed R. Crim. Pro. 8(a) ……………………………………………………………….. 2

Fed. R. Crim. Pro. 14 ………………………………………………………………... 2

**INTRODUCTION**

On June 5, 2017, a Superseding Indictment ("Superseding Indictment") was returned against Christopher Goff ("Goff") and six co-defendants. The defendants were charged with Conspiracy to Commit Wire Fraud (Count One), Wire Fraud (Count Two), Aggravated Identity Theft (Count Three), Conspiracy to Commit Money Laundering (Count Four), Conspiracy to Commit Wire Fraud (Count Five), Wire Fraud (Count Six), Aggravated Identity Theft (Count Seven), and Conspiracy to Commit Money Laundering (Count Eight).

The indictment charges two different conspiracies. Counts One through Four pertain to the conspiracy that centered around the content provider known as Tatto Media (hereafter the "Tatto Media Scheme"). This scheme is alleged to have occurred from in or about 2011, up to and including in or about 2013 (Superseding Indictment ¶ 1). The second scheme (Counts Five through Eight) is alleged to have taken place from in or about 2012, up to an including in or about 2013, and concerns the content providers known as CF Enterprises Pty and DigiMobi Pty Ltd. (hereafter the "Zhenya Scheme"). (Superseding Indictment ¶ 8). The substantive differences between the conspiracies are the years in which they were operating and the different membership of each conspiracy. The only defendant charged in both conspiracies is Darcy Wedd ("Wedd"). Goff is charged in the Tatto Media Scheme only.

This matter is set to commence trial on August 14, 2017 with respect to defendants Frazier Thompson ("Thompson"), Wedd and Goff. With respect to co-defendant Jason Lee, however, the matter is set for trial in January 2018. For the reasons set forth below, we respectfully submit that the Court should sever Goff's case from that of Wedd and Thompson and allow Goff to proceed to trial along with Lee.

1

**ARGUMENT**

<u>SEVERANCE IS WARRANTED PURSUANT TO RULE 14 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AS A JOINT TRIAL WILL SUBSTANTIALLY PREJUDE DEFENDANT GOFF AND FAIL TO SERVE THE INTERESTS OF JUSIDICIAL EFFICIENCY AND ECONOMY</u>

In cases where multiple defendants are deemed properly joined under Rule 8(a) of the Federal Rules of Criminal Procedure ("FRCP"), the Court may sever defendants pursuant to Rule 14 of the FRCP. Courts are granted wide latitude in determining whether or not to sever a defendant from a joint trial. "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the District Courts." *Zafiro v. United States*, 506 U.S. 534, 540 (1993). Rule 14 provides the following relevant instruction:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

FRCP 14. The Court, in the interests of promoting judicial economy and efficiency and avoiding multiplicity of trials, is instructed to permit joint trials. However, the mandate to promote joint trials for the above-stated reasons is not unlimited. A Court must not allow the interests of efficiency and economy to cause "substantial prejudice to the right of the defendants to a fair trial." *Zafiro v. United States*, 506 U.S. at 540 (1993) quoting *Bruton v. United States*, 391 U.S. 123, 131, n. 6 (1968).

In *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987), the Court provided an in-depth review of the factors that must be considered when deciding whether or not to sever a multi-defendant criminal action. The Court in *Gallo* identified the following factors that must be considered in determining whether the prejudice of a joint trial rises to the level of a "miscarriage of justice": (1) the number of defendants and the number of counts; (2) the complexity of the

indictment; (3) the estimated length of the trial; (4) disparities in the amount or type of proof offered against the defendants; (5) disparities in the degrees of involvement by defendants in the overall scheme; (6) possible conflict between various defense theories or trial strategies; and (7) prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant. *U.S. v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987).

The Court also warned that: "There are no precise tests applicable to one or a combination of these factors that can provide a foolproof resolution under Rule 14 … None of the factors are themselves dispositive; instead, the court must decide whether the jury would be 'reasonably able' to consider the evidence as to each defendant separately, independent of the evidence against his or her coconspirators." *Id*. Ultimately, the Court must answer the question posited by Judge Weinfeld in *United States v. Kahaner*, 203 F. Supp. 78, 81-82 (S.D.N.Y. 1962): "can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?"

When evaluating several of the factors enumerated by the Court in *Gallo,* it is clear that severance here is warranted in the interests of justice. First, with respect to the length of the trial, insofar as this Court presided over the first trial, it is in a unique position to appreciate this issue. The first iteration of *United States v. Wedd, et al.* began on April 3, 2017. The jury concluded deliberating on or about May 3, 2017. The only witness against Goff was Lin Miao, the former principal of Tatto Media. And while he testified for several days, this occurred in the first week of the trial and the remainder of the time (several weeks) was consumed solely by the Zhenya Scheme and other evidence admissible against Wedd and Thompson.

Goff lives with his wife and three young children under the age of ten years old in California. He is not affluent. He and his wife both work full-time jobs. Due to the venue and

3

estimated duration of trial, Goff, if not severed from Wedd and Thompson, will be obligated to stay approximately five weeks in New York, in addition to the five weeks he was in New York during April and May 2017. This is time away from his wife and children that not only precludes him from assisting with any of the child-rearing obligations, but also with earning any income during his absence. In contrast, were he to be tried in January 2018 along with Lee, the trial (based up a reasonable estimate from the first trial) will likely not be more than one week including jury selection and closing arguments.

Second, in complex trials, where there are multiple defendants, and multiple conspiracies alleged, it is to be expected that the weight of evidence offered against each defendant shall be varied. The Court must determine whether this disparity is likely to amount to a prejudice against an individual defendant. Defendants not charged in all of the counts, involved in only a small proportion of the evidence, and who display minor, if any, links with their fellow co-defendants are at particular risk for being prejudiced for the aforementioned reasons. *United States v. Branker*, 395 F.2d 881, 888 (2d Cir. 1968). In situations such as these the practical effect is that the jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve these defendants in any way. As trial days go by, the mounting proof of the guilt of one is likely to affect another. *Id*. Ultimately, this may reach a level of "inevitable prejudice" to the peripheral defendants is caused by "the slow but inexorable accumulation of evidence" against the major players. *United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965). The sheer volume of such evidence against coconspirators, especially when the prejudiced defendants sit in court for weeks on end without their names so much as being mentioned, can so unbalance the scales that "no amount of cautionary instructions could … undo [] the harm." *Id.* at 758.

The Government's case against Goff, during the first trial, consisted of (1) the testimony of Lin Miao, (2) email communications between Goff and Miao, and (3) bank records.  With respect to Wedd and Thompson, however, the bulk of the Government's evidence concerned acts taken by the Mobile Messenger ("MM") executive group (the "Executive Group") which included Wedd, Thompson, Erdolo Eromo ("Eromo") and Michael Pajaczkowski ("Paj").  The Government will again rely on the testimony of Eromo and Paj, as well as email communications by and between the members of the Executive Group and including additional testimony regarding parties not expected to be present at the trial such as Eugeni Tsvetnenko ("Zhenya"), Alan Sege, Esq. (MM's former General Counsel) and additional MM employees including Daryl Quan (a former Account Manager) and Jonathan Murad (a member of MM's compliance and analytics team), none of which involved Goff.

Notably, there was at the first trial (and is expected to be at the re-trial) extensive evidence of other misdeeds offered regarding the Executive Group that was not charged criminal conduct.  For example, Paj was permitted to testify that in his evaluation of things, it "could have been as many as ten times, maybe more" that he personally observed auto-subscribing and this was done in connection with testimony offered against Wedd.  (Tr. 1287:12-20, April 11, 2017). The government's theory about this testimony was that it proved that Paj knew what auto-subscribing was when he saw it as part of the conspiracy. (Tr. 1373:14-24, April 11, 2017)  The Court aslo permitted testimony about Eugeni Tsvetnenko (a/k/a "Zhenya") and his having been caught auto-subscribing in Canada and how Wedd knew about it.  (Tr. 1372:3-1376:22, April 11, 2017).  There was also the extensive evidence offered of the deceptive marketing scheme, none of which involved Goff.  (*See, e.g.,* Tr. 2430:4-2432:15 (incentivized marketing)).  In fact, on several occasions the Court had to give curative instructions in an effort to protect Goff from this

5

damaging evidence offered against Wedd and Thompson.  (*See, e.g.* Tr. 1816:24-1817:21, April 13, 2017; Tr. 2423:3-11, April 18, 2017).

Spillover evidence detrimentally affects a defendant's rights when "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against the defendant." *Zafiro v. United States*, 506 U.S. at 539 (1993).  As noted:

> For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.

*Zafiro v. United States*, 506 U.S. at 539 (1993) citing *Kotteakos v. United States*, 328 U.S. 750, 774-775 (1946).  The Second Circuit has noted that prejudice can occur in a spillover situation when "proof inadmissible against a defendant becomes a part of h[er] trial solely due to the presence of co-defendants as to whom its admission is proper." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).  Nevertheless, "[a] defendant's claim that [s]he [will be] prejudiced by the admission of evidence at a joint conspiracy trial is [therefore] insupportable when the evidence would [be] admissible against h[er] in a separate trial alone as a member of the conspiracy." *United States v. Feng Ling Liu*, 2014 U.S. Dist. LEXIS 31588, *5 (S.D.N.Y. Mar. 7, 2014).

Most of the evidence against the Executive Group, specifically the attempts to connect the Executive Group with deceptive marketing and other knowledge of misconduct by Zhenya and the other participants in the Executive Group (Wedd, Thompson, Eromo and Paj), would not likely have been admissible in a trial solely against Goff (as it will not likely be in a trial against Lee).  The Government's theory in this regard for this evidence is that was necessary to explain

6

the "close relationship between [the Executive Group] and their willingness to engage in criminal conduct together." (ECF #283, March 24, 2017 letter from AUSA Paul). It was also to "explain why they also chose to engage in the auto-subscription scheme; because by engaging in noncompliant marketing through their shell companies, they were at risk of having those short codes shut down and that revenue stream dry up." (Tr. 1465:2-7, April 12, 2017). The risk is that both auto-subscription schemes are linked as one even though the Prosecution did not establish, nor even argue, that Tatto's auto-subscription scheme flowed from, or had anything to do with, deceptive marketing. In fact, Lin Miao testified that the auto-subscribed customers were not marketed to at all. (Tr. 186:16-187:4, April 4, 2017).

In the course of the discussion, while the jury was excused, regarding the importance of the background information on the Executive Group and the shell companies created, the Court demonstrated that it was aware of the potential for prejudice against the Defendants:

> The government contends that this evidence is also direct evidence of the conspiracy charged and necessary to complete the story of the crimes charged and not other act evidence. The Court agrees. However, the Court also agrees with defendants that the amount of time spent on such evidence and the manner of presentation could lead to confusion.

(Tr. 1466:14-19, April 12, 2017). The Court further elaborated: "The concern is that we've got to, I think, be careful about limiting the extent to which the defendants in this auto-subscribing case get tarred and feathered with some belief that there's just generally fraudulent people because of these other acts. That's precisely what we are supposed to try to avoid." (Tr. 1483:13-18, April 12, 2017).

Nevertheless, the Government chose to pursue this avenue because they wanted to show that deceptive marketing was widely known throughout MM. (Tr. 1788:9-12, April 13, 2017). The Court, recognizing the possibility that jurors may conflate the knowledge held by members

7

of the Executive Group onto other, unnamed employees of MM, warned against making such an argument. (Trial Tr. 1788:13, April 13, 2017). In spite of the warning, Paj's testimony does connect the deceptive conduct engaged by the Executive Group to the alleged knowledge of the deceptive conduct by other MM employees (and not just the Executive Group). For instance, Paj testified about his participation in bribing industry officials. According to Paj, the following people were aware of the bribery: "Darcy, Erdolo, Fraser, sometimes *some of the account managers* depending on who they were, and sometimes the carrier managers in charge of those carriers." (Tr. 1845:1-3, April 13, 2017 (emphasis added)). This general, non-specific testimony (not linked to Goff but necessary presumably with respect to Wedd and Thompson) paints with broad strokes and risks pulling Goff into a level of knowledge that is unproven (simply because he too was an Account Manager). It is unlikely that were Goff on trial alone the Court would permit such testimony. Despite the Court's warning and limiting instructions, Paj was able to turn the story of one bribe into a common (if not particularly well defined) practice of bribing employees of telephone carriers, without ever providing evidence of these additional bribes by saying, in effect, "everyone knew about it" without linking it to Goff. This concern is especially acute in the case of Goff, whose direct supervisors from MM, Eromo and Thompson, are both involved in this case. There is a real risk that the jury will conclude that everyone at MM was involved in some sort of criminal scheme, merely because of the wealth of evidence about MM schemes that Goff was not involved with or aware of.

Evidence of the following bad acts were offered with respect to the cases against Wedd and Thompson that had nothing to do with Goff:

- multiple States Attorney General's investigations (Tr. 1829:2-15, April 13, 2017),

8

- the Federal Trade Commission's investigation of MM (Tr. 1813:9-1816:20, April 13, 2017)

- bribes to mobile telephone companies, including a reference that "some of the account managers" knew, without linking specifically to Goff (Tr. 1844:18-1845:3),

- kick-backs to high-level MM employees (Tr. 1606:21-1607:18, April 12, 2017), and

- kickbacks to lower level employees, such as Daryl Quan, an account manager like Goff (Tr. 2603:4-2604:14, April 19, 2017).

The information entered into the record during the first trial significantly prejudiced the jury against Goff by exposing the jury to the machinations of the Executive Group with regard to multiple schemes (which included other MM employees that had no involvement or interaction with Goff) and implying that MM as a whole (and not just a few parties working there) were engaging in rampant fraudulent and illegal activity well beyond the autosubscription scheme. The potential prejudicial spillover effect therefore can be entirely avoided with separate trials. This is a unique situation where the Court has to have two trials. There is no added efficiency of adding Goff to the first trial. The sum total of Miao's testimony relevant to Goff was approximately 50 pages of the transcript. It is of no negative impact on the government if that testimony is offered in August or five months later at the Lee trial, where Miao will have to testify regardless. Yet, as set forth above, the potential prejudice is significant (as this Court has noted and attempted to minimize at the first trial). On the other hand, the prejudice to the

9

Government is literally none – it must try this matter twice regardless of whether Goff is tried in August 2017 or January 2018.

Finally, "[i]It is 'not unreasonable' to conclude that in most cases the jury 'can and will' follow the judge's instructions to disregard information as to certain persons or charges. *Bruton v. United States*, 391 U.S. 123, 134 (1968). Nevertheless, "[t]o expect a jury to perform the intellectual feat in a joint trial of using such proof against seven defendants but not against three is to ask too much of lay (and perhaps of judicial) minds." *Gallo,* 668 F. Supp. at 753, quoting *United States v. Praetorius*, 462 F. Supp. 924, 928 (E.D.N.Y. 1978).

## **CONCLUSION**

For the foregoing reasons, this Court should grant Mr. Goff's motion for severance from Defendants Wedd and Thompson.


Dated: New York, New York
July 10, 2017

        Respectfully submitted,

        SIMON & PARTNERS LLP

        By:   /s/Kenneth C. Murphy
                Kenneth C. Murphy
                Terrence Johnson
                Robert Gendelman

        551 Fifth Avenue
        31st Floor
        New York, New York  10176
        (212) 332-8900

        *Attorneys for Defendant Christopher Goff*