# SERCARZ & RIOPELLE, LLP

810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

ROBERT CALIENDO
GIULIANA E. GRAHAM

*ADMITTED IN NY & NJ

July 19, 2017

***BY ECF***

The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

> ***Re:*** ***United States v. Darcy Wedd, et al., 15 Cr 616 (S-3)(KBF)***
> ***Letter Request To Join ECF Nos. 407 & 408***

Your Honor:

We join the motions filed by counsel for Fraser Thompson, seeking (1) to dismiss those counts of the current Superseding Indictment which charge the defendants with Aggravated Identity Theft; and (2) to preclude the introduction of evidence that the Executive Group of Content Providers engaged in non-compliant marketing.

In addition, we would request that, at the retrial, the Government be precluded from eliciting on the direct testimony of Michael Pajaczkowski, that he allegedly observed ten separate instances of auto-subscribing by content providers on the Mobile Messenger Aggregation Platform.

## We Join In The Motions By Counsel For Fraser Thompson

In addition to the reasons advanced by counsel for Mr. Thompson in support of his application to preclude evidence that the Executive Group of Content Providers engaged in non-compliant marketing, we would note that, during the rebuttal summation, the Government advanced the argument – in violation of Fed.R.Evid. 404(b) – that this was demonstrative of the propensity on the part of Wedd and Thompson to engage in criminal activity:

Did they skim money off the top? Did they have side deals? Yes. But they were partners in this business

You heard from it Mr. Wedd himself, 25 percent for each of them, four guys sharing the proceeds, they were partners.

And ladies and gentlemen, consider this. They money flow – I'm not going to put that chart with the money flow back up, but you remember the money flow from their scheme to run all these content providers on the side was the exact same money flow that they got from CF, and Digi, Zhenya's companies that auto-subscribed, the exact same money flow.

Ladies and gentlemen, this is a big deal. It builds the foundation that allowed Wedd and Thompson to auto-subscribe.  They were willing to work in secret with their Mobile Messenger buddies, Paj and Eromo, against the wishes of Mobile Messenger in violating the trust that was placed in them

Together they ran these content companies.

Together they violated their conflict of interest provisions.

Together they deceived auditors Mobile Messenger telephone companies, together.

But Mr. Sercarz suggests here, even though they did all of that stuff together in secret, they would never, ever do this other thing together in secret.

That is nonsense.  These four men worked together to prop up Mobile Messenger and line their own pockets in every way they could, including auto-subscribing.

(Tr-4187-88).

**The Government Should Be Precluded From Offering Testimony Regarding Numerous Alleged Instances Of Auto-Subscribing On The Mobile Messenger Aggregation Platform That Are Not Linked, <u>In Any Way, To The Allegations In This Indictment</u>**

On direct examination, Pajaczkowski testified regarding his responsibilities with respect to compliance and audit management.  (Tr-1283).  The Government used the opportunity to demonstrate the witness' "expertise" on the subject of auto-subscribing:

Q:    In your role for analytics, what types of things did you look for and did
your team look for to indicate that a content provider was engaged in auto-
subscribing?

A:    We had a comprehensive suite of tests that number may be 30, individuals
tests to look for fraudulent activity. It looked for things like the time in
seconds between PIN message and the welcome message.  It looked for
times when the messages themselves were out of order.  So instead of
going PIN, welcome, content message, it might also go welcome, PIN,
content message.  Things like the conversion ratio, so how many people
actually bought the product, were offered the product and bought the
product.

That's three of them, the list is very long.

(Tr-1285-86).

Counsel objected to these questions.  (Tr-1286).

The Government then elicited that Pajaczkowski and his analytics team detected 10
separate instances of auto-subscribing between 2010 and the end of his tenure at Mobile
Messenger:

Q:    So, from that point forward, until the end of your time at Mobile
Messenger in 2013, approximately how many times did you and your
analytics team detect instances that you believed to be auto-subscribing?

A:    It could have been as many as ten times, maybe more.

(Tr-1287).

The Government went on to elicit that these instances were the subject of conversation
between Pajaczkowski and Wedd and that the two of them made light of these problems:

Q:    During the course of those conversations, did you and Mr. Wedd have any
terms that you used to describe the behavior that you had identified?
A:    Yes

Q:    What were those terms?

A:    We would call it auto-subbing, and we had – I had a silly word, it's called
Hibbita Dibbita.  It's just a silly word that we used together that we threw
around.

(Tr-1291-92).

This testimony prompted counsel to seek a mistrial.  (Tr-1306-07).

3

We respectfully submit that any testimony by Pajaczkowski regarding the efficacy of his scheme of analytics runs afoul of Fed.R.Evid. 701 and 702.

The error is compounded when Pajaczkowski is then allowed to offer his conclusion that the scheme of analytics detected 10 separate instances of auto-subscribing on the Mobile Messenger Aggregation Platform.  These "other bad acts" are never linked to a specific content provider; nor are they cabined by date.  As a result, it becomes impossible effectively to confront and cross examine the witness regarding this testimony.

Moreover, the fact that Pajaczkowski allegedly spoke to Wedd about these episodes of auto-subscribing; and, that they made light of the issue, has little probative value unless it can be demonstrated that these instances are linked to the same content providers that are the subjects of this Indictment.  Any marginal relevance is far outweighed by the danger that the evidence will be used to establish the defendant's "propensity" to engage in the crimes charged.

Accordingly, we object to any effort by the Government to elicit testimony along these lines, at the retrial.

## Conclusion

Of course, we renew all motions in limine previously made on behalf of the defendant, Wedd.


Most respectfully,

/s/

Maurice H. Sercarz

cc:     All Parties (by ECF)