*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 19, 2017

**BY ECF**
The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    **United States v. Darcy Wedd, et al.,**
             **S3 15 Cr. 616 (KBF)**

Dear Judge Forrest:

      We write in opposition to the *in limine* letter motions filed by defendants Darcy Wedd (ECF No. 404) and Fraser Thompson (ECF 408) on July 12, 2017. In those motions, defendant Wedd, joined by defendant Thompson, argues, *first*, that the defendants should be granted broader latitude to present evidence that they were involved in other initiatives at Mobile Messenger, including Aggregator Consent Management ("ACM"), and *second*, that the court should preclude testimony that Zhenya was known to be a "bad actor" or a "prolific auto-subscriber. (*See* ECF No. 404.) Defendant Thompson, additionally, moves to, *first*, admit a series of "Quan Emails" that were precluded during the prior trial in this matter (the "Prior Trial") and, *second*, to preclude the Government from offering any evidence that the defendants engaged in deceptive and/or non-compliant marketing. (*See* ECF No. 408.) For the reasons set forth below, the Government respectfully submits that these motions should be denied in their entirety.

      **I.**    **The Defendants Should Not be Granted Broader Latitude to Present Evidence of Their Involvement in Other Initiatives at Mobile Messenger**

      During the Prior Trial, the parties addressed, on multiple occasions, the extent to which the defendants could present evidence of other, lawful work they performed for Mobile Messenger ("MM"). As the Government previously noted, a defendant generally "may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990). "Evidence of a defendant's past 'good acts' is only relevant where 'a defendant is alleged to have always or continually committed bad acts or where the evidence of good acts would undermine the underlying theory of a criminal prosecution." *United States v. Balboa*, No. 12 Cr. 196 (PAC), 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013) (quoting United States v. Damti, 109 Fed. App'x 454, 455–56 (2d Cir. 2004)). (*See, e.g.*, Govt. Letter of 4/3/17, ECF No. 300.)

The Court, in response to the parties' arguments, held that "case law precludes the use of noncriminal behavior by a defendant to suggest to a jury that he would not have engaged in the criminal behavior charged," and that it "view[ed] the nature of the evidence defendants seek[] to introduce as largely falling into the 'irrelevant' category.'" (Order of 4/11/17, ECF No. 320, at 3-4 (attached as Exhibit A to Wedd's motion).) In particular, the Court found that:

1. The direction the PSMS industry was moving generally is irrelevant;
2. Any technical details of any of the projects are irrelevant;
3. That Wedd may have been working hard to move MM's business in any lawful direction is also irrelevant (with the caveat described below);
4. That Wedd and/or Thompson may have had projects that resulted in consumer-facing applications that allowed donations to political campaigns or charitable causes is irrelevant.[1]

(*Id.* at 4.) The Court did allow, with limitations, the defendants to present evidence that, *first*, they "may have been so busy on other things that they did not focus on the allegedly criminal conduct in front of them," and *second*, "[t]heir view of what was needed for the survival of MM may have been that if they took any action that resulted in potential consumer backlash, it would imperil the MM business." (*Id.* at 5.) As to the first, "no conscious avoidance" point, the Court allowed only: "1. A list of the projects or initiatives on which the defendants were working; 2. The amount of time and attention they spent on such projects; 3. Number 2 must be specifically connected to something that supports that such work was so preoccupying that it somehow prevented or impeded attention to other areas." (*Id.* at 6.) As to the second, "binary choice" point, the Court found that the defendants could make that point "through non-technical, high level evidence in order to allow the defendants to argue during their closing that this binary choice supports an inference against the requisite intent." (*Id.* at 7.)

With respect to the "no conscious avoidance" point, there is no basis to permit more evidence than the Court permitted, and that the defendants introduced, during the Prior Trial. At the Prior Trial, Wedd testified that he and Thompson were preoccupied with various other initiatives at Mobile Messenger, which consumed large portions of their time, and that they – particularly Wedd – were also engaged in frequent business travel. (*See, e.g.*, Tr. at 3500-3505 (testimony regarding various business trips taken by Wedd).) The defendants have thus already had "the opportunity to demonstrate the extent of the time and travel undertaken by Mr. Wedd in pursuit of these projects," as they now contend they wish to do. (*See* ECF 404 at 3.) Additional testimony regarding the details of the various projects, including the "efforts by Silver Lake" to take MM public (*see id.*), would not support a theory of "no conscious avoidance," and would be irrelevant, distracting, and potentially confusing for the jury. The defendants should not be permitted to proceed down that path.

---

[1] During the Prior Trial, before this ruling from the Court, the defendants had referenced some of these topics – including the donations to political campaigns and charitable causes – in their opening statements to the jury. In light of the Court's ruling, the defendants should be precluded from doing so again.

With respect to the "binary choice" point, the defendants' argument regarding the Aggregator Consent Management ("ACM") initiative simply does not support the theory that the defendants were faced with a binary choice. The defendants argue that the ACM initiative is indicative of a lack of intent to engage in auto-subscribing because it would have "move[d] the entire industry to the equivalent of a full service platform," where auto-subscribing was not possible. (*See* ECF 404 at 3.) The defendants, however, obviously had the opportunity to auto-subscribe on the aggregation platform while the ACM project was in the development stages. And auto-subscribing did, indeed, take place on that platform. So even if it is true that ACM, if implemented, would ultimately have put a stop to auto-subscribing, it in no way prevented the defendants from trying to profit from auto-subscribing while they still could.[2] Accordingly, the existence of the ACM initiative is not evidence of a binary choice, *i.e.*, it is not evidence that in the view of the defendants, "if they took any action that resulted in potential consumer backlash, it would imperil the MM business." (*See* Order of 4/11/17, ECF No. 320, at 5.) In addition, the defendants do not dispute the fact that while auto-subscribing may not have been possible on a full-service platform, non-compliant and deceptive marketing *were* possible on a full-service platform. As the Court has recognized, "noncompliant marketing would likely lead to consumer complaints, which would cause just the sort of carrier concern that the 'binary choice' argument suggests the defendants were desperate to avoid." (*Id.* at 8.) Evidence that the defendants were pushing for an initiative that would have allowed deceptive and noncompliant marketing to take place is, therefore, certainly not evidence that the defendants were trying to avoid consumer backlash and protect MM from harm. Additional evidence regarding the ACM project would thus be a sideshow, and it should not be allowed.

## II. The Testimony Regarding Zhenya Links Directly to the Defendants' State of Mind and Is Appropriate

The defendants also seek to preclude testimony from Michael Pajackowski about his understanding that the content provider Eugeni Tsvetnenko, a/k/a "Zhenya" ("Zhenya") had previously engaged in aggressive, non-compliant, and at times criminal activity in the Premium SMS industry. (*See, e.g.* Tr. at 1590 (Pajaczkowski testimony regarding his awareness that "Zhenya was a prolific auto-subscriber" and had "a well-earned reputation for, when he was actually advertising, being very aggressive").) This testimony was plainly proper, because Mr. Pajaczkowski also testified that prior to January of 2012 – when the charged scheme to auto-subscribe with Zhenya began – Mr. Pajaczkowski discussed his understanding of Zhenya's prior business practices with both Wedd and Thompson. (*Id.*) Mr. Pajaczkowski's testimony included several specific examples of such discussions, which were supported by contemporaneous email correspondence, including email correspondence from the middle of 2011 concerning Zhenya having auto-subscribed a regulator in Canada. (*See id.* at 1590-1600, 1700-1716.) The testimony from Mr. Pajaczkowski thus contained the very sort of "linkage" between Zhenya's

---

[2] Contrary to the defendants' suggestion, Erdolo Eromo did not "mischaracterize" the ACM initiative as some type of "effort to continue in the business of auto-subscribing" (*see* ECF 404), nor did he testify that auto-subscribing even would have been possible through ACM. Regardless, the question of whether ACM would have allowed for auto-subscribing is entirely separate from the question of whether the defendants intended to engage in auto-subscribing before ACM was ever implemented.

activities and the defendants' knowledge that the defendants contend is required. (*See* ECF 404 at 4.) And there is no question that Wedd and Thompson's knowledge of Zhenya's prior practices, including prior occasions when Zhenya auto-subscribed, is directly relevant to their knowledge of and participation in the charged crimes. The defendants' motion to preclude this testimony should therefore be denied.[3]

### III. The "Quan Emails" Should Again Be Precluded Under Rule 403

Defendant Thompson also moves to admit the "Quan Emails" that the Court precluded at the Prior Trial. Specifically, Thompson moves to admit DXs 508, 509, 510, 511, 512, 517, 518, 522, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539 and 540. He then continues to argue, as he did at the Prior Trial, that these emails – and Thompson's non-inclusion in many of the emails – are somehow relevant to "whether or not Thompson knew of the auto-subscription scheme." (*See* ECF 408 at 2.)

As the Court previously ruled, however, these documents are "irrelevant to that and also highly misleading." (Tr. at 2908-17.) As the Court found, it was "quite clear" that Mr. Eromo never testified that "Mr. Thompson was the only one working on short codes." (*Id.*) Rather, "[h]e said that they were, number one, working on short codes together; two, he very specifically says that Quan, Daryl Quan was the main guy . . . implementing the day-to-day stuff." (*Id.* at 2908-09.) The volume of the "Quan Emails" are "suggestive of a theory of the case that is along the lines of suggesting that Mr. Thompson wasn't involved in this, and these don't rebut the Eromo testimony that you need to rebut in that regard, because showing Daryl Quan day after day basically doing relatively mundane tasks to get these short codes up and going does nothing to show that Mr. Fraser Thompson wasn't somehow involved in the strategic decision making." (*Id.* at 2909.) Thus, as the Court concluded, nothing about these documents "prove or disprove participation in the conspiracy by Mr. Thompson . . . [h]e didn't have to be in any way involved in a direct communication relating to any particular Digi or CF short code, he being Mr. Thompson, in order for him nonetheless to have been involved." (*Id.* at 2910-11.) Further, as the Court also found, the sheer volume of the documents risked "mislead[ing] the jury into a sense that Mr. Quan is truly the bad actor," and that "Mr. Thompson was somehow not the guy." (*Id.* at 2911-13.) This "alternative-perpetrator scheme" had "no basis in the record" and, regardless, even had Quan been a bad actor, "it wouldn't matter" because "[y]ou could have numerous bad actors, and it doesn't go to whether any particular defendant on trial is or is not

---

[3] Wedd, in a belated motion filed earlier today, also seeks to preclude testimony from Mr. Pajaczkowski regarding his belief that he had detected approximately ten instances of auto-subscribing between 2010 and the end of his tenure at MM, and that he and Wedd had discussed and made light of those problems. (*See* ECF 412 at 2-4.) Wedd's knowledge of other instances of auto-subscribing at MM, and evidence that he made light of the practice of auto-subscribing, is plainly probative of Wedd's knowledge and intent to commit the charged auto-subscribing crimes. Nor did Mr. Pajaczkowski's testimony concerning prior instances of auto-subscribing constitute "expert" testimony. (*See id.*) Rather, it was clearly percipient testimony based on Mr. Pajaczkowski's direct knowledge and experience working in compliance and analytics at MM. Accordingly, Wedd's belated motion should be denied.

Case 1:15-cr-00616-KBF   Document 413   Filed 07/19/17   Page 5 of 6

Page 5

guilty of the crimes with which they have been charged." (*Id.* at 2911-12.) Accordingly, the Court excluded the documents pursuant to Rule 403 (*id.* at 2918), and should do so again now.

### IV. Some Evidence of the Defendants' Involvement in Deceptive and/or Non-Compliant Marketing Should be Permitted, as Appropriate

Finally, defendant Thompson argues that the Government should be precluded from offering any evidence of the defendants' complicity in deceptive or non-compliant marketing schemes. As set forth in the Government's July 12, 2017 *in limine* motion, the Government is seeking to offer evidence that: (a) Wedd, Thompson, Pajaczkowski, and Eromo were engaged in a separate Content Provider scheme without MM's knowledge at the time of the auto-subscribing conduct charged; and (b) the money flows for the Content Provider and auto-subscribing schemes were co-mingled. (*See* ECF 403 at 7.) As the Government has also stated, its present intention is to offer little, if any evidence in its case-in-chief of deceptive marketing practices involved with the Content Provider scheme, although it may offer testimony to explain that the scheme carried risks because it involved advertisements that were not compliant with industry regulations. (*See id.* at 7 n.2.) The Government has reserved the right to reassess its position in response to defense arguments that may be advanced at trial, to the extent those arguments bear upon this issue. (*See id.* at 8 n.2)

The Government's position is reasonably reflective of the evidence in the case and the various defense arguments that have been advanced. Contrary to the defendants' suggestion, evidence regarding the Content Provider scheme is not being offered as evidence of the propensity of any of the defendants to engage in criminal activity. (*Cf.* ECF 412 at 1-2.) Rather, as discussed in the Government's *in limine* motion, and as articulated at the Prior Trial, evidence of the Content Provider scheme is being offered because it is inextricably intertwined with the charged crimes, because it establishes the relationship of trust and confidence between the co-conspirators, and because it is probative of the co-conspirators' willingness to work together to make money behind MM's back. (*See id.* at 7; *see also* Tr. 4187-88 (portion of rebuttal summation highlighting evidence of how the co-conspirators secretly worked *together* to engage in the Content Provider scheme).) In connection with explaining the Content Provider scheme, including the risks that the scheme carried, the Government believes that it will likely be necessary – as it was at the Prior Trial – to offer some testimony that the scheme involved advertisements that were not compliant with industry regulations. All of this evidence is properly admissible.

Additional evidence of deceptive or non-compliant marketing efforts by the defendants would also be appropriate to rebut a defense argument that, in the defendants' view, "if they took any action that resulted in potential consumer backlash, it would imperil the MM business." (*See* Order of 4/11/17, ECF No. 320, at 5.) Indeed, the Court has recognized that such a defense "opens the door to rebuttal by the Government that the defendants engaged in other conduct that demonstrates that defendants had already chosen one path versus the other." (*Id.* at 7.) As the Government has previously noted, the defendants' willingness to assist content providers in wide-scale deceptive marketing practices is evidence that they elevated their personal profit motives over the risk that phone carriers would be reticent to enter into other lines of business with MM as a partner. Accordingly, depending on the arguments advanced by the defense,

Case 1:15-cr-00616-KBF   Document 413   Filed 07/19/17   Page 6 of 6

Page 6

additional evidence of the defendants' deceptive or non-compliant marketing efforts may be appropriate, and it would certainly be inappropriate to preclude such evidence wholesale.  For these reasons, defendant Thompson's motion should be denied.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:   /s/ Sarah Paul
Sarah E. Paul/Richard Cooper/
Jennifer L. Beidel
Assistant United States Attorneys
(212) 637-2326/1027/2212

cc:   All defense counsel (by ECF)