

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 10, 2017

**BY ECF**
The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    <u>United States</u> v. <u>Darcy Wedd, et al.</u>,
                S3 15 Cr. 616 (KBF)

Dear Judge Forrest:

      The Government writes to seek broader latitude to elicit testimony at trial from Lin Miao regarding defendant Darcy Wedd's assistance in responding to the Washington State Attorney General action filed against Tatto.

      At the prior trial in this matter (the "Prior Trial"), the Government was permitted to elicit certain testimony from Miao regarding his history and prior dealings with Wedd, to demonstrate the relationship of trust between them and provide context for why Miao felt comfortable seeking Wedd's assistance with auto-subscribing.  Specifically, the Government was permitted to elicit testimony from Miao about his belief that Wedd had offered to pay for prostitutes and drugs for Miao, and that Wedd had helped Miao in responding to audits and lawsuits.  The Government was not, however, permitted to elicit from Miao details about a particular lawsuit, filed by the Washington State Attorney General, with which Wedd assisted him.  The Government now seeks leave to elicit the limited additional testimony from Miao, in sum and substance, that:  (1) in 2009, Tatto was sued by the Washington State Attorney General; (2) in determining how to respond to that lawsuit, Miao turned to Wedd for help; (3) Wedd helped Miao by referring him to Mobile Messenger's in-house counsel, Alan Sege; (4) Sege then represented Tatto in the lawsuit, and assisted Tatto in negotiating a settlement of the lawsuit with the Washington State Attorney General; and (5) shortly thereafter, Tatto was caught violating the requirements of the settlement, and had to settle the lawsuit again.

      At the Prior Trial, the Court found that under a Rule 403 analysis, it would have allowed in testimony from Miao about the Washington State Attorney General lawsuit, but that in the totality of the circumstances the testimony did not seem necessary. (*See* Tr. at 218.)  The Court, however, made that ruling during Miao's direct examination, prior to having the opportunity to see how Miao's cross-examination would unfold, and how the other evidence in the case would fit together.  The Government respectfully submits that at this trial, in light of the cross-examination questions that Miao is expected to be asked, and considering the other evidence that the Government intends to present, the testimony is important and should be allowed.

*First*, during the Prior Trial, Miao's testimony regarding his relationship of trust with Wedd, and the role that relationship played in Miao's decision to approach Wedd about auto-subscribing, was heavily challenged on cross-examination. For instance:

> Q: You mentioned that Darcy Wedd was your friend and your mentor. Do you recall that?
> A: Yes.
> Q: That is not why you went to Darcy Wedd on October 10, 2011, is it sir?"
> A: Can you rephrase that question?
> Q: Sure. Your friendship with Mr. Wedd didn't lead you to go and talk to him about auto-subscribing until you were caught, isn't that correct, sir?
> A: He was a friend, and I felt comfortable approaching him about the subject.
> Q: Why didn't you approach him in September of 2011, sir?
> A: Because I didn't know if that would be something that would be allowed on the Mobile Messenger platform.
> Q: Why didn't you approach him when you were sitting down with Mr. Pearse and Mr. Govani and talking about breaking the law on the grand scale by auto-subscrib[ing]? Why wasn't he invited to that meeting?
> A: Because he didn't need to at that point in order for us to subscribe.
> Q: The fact that in 2007 when you were 20 years old somebody at Mobile Messenger paid for a prostitute for you and later on you heard that Darcy Wedd was involved in that transaction, that had nothing to do with why you went to him in 2011 to have that meeting, isn't that correct, sir?
> A: I felt – I thought that was a great gesture, and it helped build that friendship.

(Tr. at 524-25.) Some additional evidence regarding the relationship between Miao and Wedd – particularly evidence of Wedd having assisted in resolving a serious lawsuit filed against Miao's company – is thus important to explain why Miao felt comfortable approaching Wedd and speaking openly with Wedd about auto-subscribing. Miao's credibility is sure to be challenged, once again, on this issue, and Miao should be given the ability to explain the relationship further.

*Second*, evidence admitted at the Prior Trial, which the Government intends to introduce again, links back to the Washington State Attorney General lawsuit and underscores the relevance of understanding that event more fully. Michael Pajaczkowski, who testified after Miao at the Prior Trial, testified that while Tatto was operating on Mobile Messenger, Tatto reached a settlement with the Washington State Attorney General, and then failed to comply with the terms of that settlement. Pajaczkowski further testified that Tatto's failure to comply with the terms of the settlement was a serious problem inside of Mobile Messenger, which led to Mobile Messenger prohibiting Tatto, for a period of time, from signing up new subscribers. Notably, when defense counsel raised the question of whether this testimony from Pajaczkowski "doesn't exceed the parameters of the Court's ruling on the Washington Attorney General," the Court responded, "I have to tell you, as this trial has proceeded and I have learned more about the role of content providers and their marketing in various ways, without characterizing it, it's become clear to me that there has to be a certain amount of background in order to explain the relationships here and how things evolved in terms of the scheme charged." (Tr. at 1325.) The Court then permitted the testimony.

      Thereafter, the Washington State Attorney General lawsuit came up again during the testimony of Erdolo Eromo. Eromo testified that in March of 2012, Tatto was being re-vetted by one of the phone companies (the "Phone Company"), and the re-vetting process put Tatto's short codes – on which Tatto was then auto-subscribing – in jeopardy. As Eromo testified, Miao believed that Eromo had a contact who was working with the Phone Company and who could assist Tatto in making it through the re-vetting successfully; accordingly, Miao offered to pay Eromo several hundred thousand dollars if Eromo could help Miao save the short codes. Eromo, in turn, offered to split that money with defendant Fraser Thompson, who Eromo enlisted to assist in trying to save Tatto's short codes. In connection with the effort to save the short codes, Alan Sege sent Miao an email on March 8, 2012, copying both Eromo and Thompson. (*See* GX 202, 202A, & 202B.) In the email, Sege suggested, in substance, that Miao provide a letter explaining why Tatto had failed to disclose to the Phone Company the fact that, in 2009, Tatto had entered into a consent decree with the Washington State Attorney General in settlement of Washington State Attorney General lawsuit. (*See* GX 202.) Sege drafted this letter for Miao and told him to address the letter to Thompson, so Thompson could have the letter on hand if needed with the Phone Company. (*See id.*) Sege attached to the email a copy of the consent decree, which was signed by Sege as Tatto's attorney (*see* GX 202A), and a copy of the draft letter, which was addressed to Thompson (*see* GX 202B).

      The fact that the Washington State Attorney General action again became an issue in March of 2012 – during the period of time when Tatto was auto-subscribing at Mobile Messenger, and in the context of a short code rescue effort for which Eromo and Thompson stood to receive hundreds of thousands of dollars from Miao – makes it all the more important that the jury be provided context as to what happened when the lawsuit first arose. That context includes the fact that Miao reached out to Wedd for Wedd's help with the lawsuit, and that Wedd referred Miao to Sege, Mobile Messenger's in-house counsel, who assisted Miao in resolving it. That context also includes the fact that, as Pajaczkowski testified during the Prior Trial, Tatto's failure to comply with the terms of the settlement caused a problem within Mobile Messenger. In addition to being relevant to the relationship of trust between co-conspirators, and the development in their criminal dealings with each other, it is also part of the background to the charged Tatto scheme. The Government thus respectfully requests that the proffered testimony be allowed.

                                Respectfully submitted,

                                JOON H. KIM
                              Acting United States Attorney

                       By:   /s/ Sarah Paul
                             Sarah E. Paul/Richard Cooper/
                             Jennifer L. Beidel
                             Assistant United States Attorneys
                             (212) 637-2326/1027/2212

cc:       All defense counsel (by ECF)