

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 13, 2017

**BY ECF**
The Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: **United States v. Francis Assifuah, a/k/a "Francis Assif",**
      **S2 15 Cr. 616 (KBF)**

Dear Judge Forrest:

  The Government respectfully submits this letter in advance of the sentencing of defendant Francis Assifuah, a/k/a "Francis Assif." As set forth in the Presentence Investigation Report ("PSR"), the Guidelines range is 33 to 41 months' imprisonment. (PSR at 31). The Probation Office recommends a below-Guidelines sentence of 18 months' imprisonment, while the defendant requests a non-incarceratory sentence. (PSR at 31; Def. Sub. at 5). For the reasons set forth below, the Government respectfully submits that a Guidelines range sentence of 33 to 41 months' imprisonment would be fair and appropriate.

**A. Background**

  **1. The Offense Conduct**

  From 2011 through 2013, the defendant and others engaged in a massive scheme to defraud ordinary consumers by placing unauthorized charges for premium test messaging services on their cell phone bills through a practice known as auto-subscribing. (PSR ¶ 13). The scheme essentially involved two main players in the cell phone industry: aggregators and content providers. (PSR ¶¶ 15-16). Mobile Messenger, which was the aggregator that played a central role in the scheme, provided many of the phone numbers of the consumers who would be autosubscribed and the mechanism that permitted the charges for those unwanted services to appear on the consumers' cell phone bills. (*See, e.g.,* PSR ¶¶ 16, 28, 31). The content providers sent consumers the unwanted text messages that ultimately resulted in them being billed for services they had not authorized. (PSR ¶ 16). These messages consisted of a pin message, a welcome message, and content messages.

  In the autosubscribing scheme, Mobile Messenger worked with three sets of content providers: (1) Tatto Media, which was operated by Lin Miao; (2) CF Enterprises and DigiMobi, which were operated by Zhenya, and (3) Bleam Technology, which was operated by the defendant.

(PSR ¶¶ 24-26). These three sets of content providers were essential to the scheme. Without them, no autosubscribing could have occurred.

The defendant is a former Mobile Messenger employee. While at Mobile Messenger, the defendant worked with and befriended Erdolo Eromo ("Eromo"). (PSR ¶ 39). In early 2012, Eromo approached Michael Pajaczkowski ("Paj"), a fellow Mobile Messenger employee, and asked to participate more actively in the autosubscribing scheme Paj and others were engaging in with Tatto. (PSR ¶ 39). After Paj told Eromo there was no room for him in the Tatto scheme, Paj suggested that they recruit another content provider with technical expertise to help them expand the scheme. (Tr. of August 14, 2017 Trial ("Tr.") 1296-97). Eromo then met with the defendant at a trade show in Las Vegas and presented him with the plan to autosubscribe. (Tr. 1566). Eromo essentially proposed that the two would use autosubscribing to get Bleam off the ground as a content provider and ultimately would switch to providing "legitimate" premium SMS services that were advertised to consumers. (Tr. 1298). By the time Eromo returned from the Las Vegas trade show, the defendant had agreed to become involved in autosubscribing. (Tr. 1566). Eromo then proposed to Paj that they begin autosubscribing with the defendant at Bleam. (PSR ¶ 39; Tr. 436). Paj agreed, although he was concerned that the defendant's computer system at Bleam was not sophisticated enough to support the autosubscribing scheme. (PSR ¶ 39: Tr. 437).

In February 2012, the defendant, in consultation with Eromo, signed a contract making Bleam a content provider on the Mobile Messenger platform. (PSR ¶ 40). On April 9, 2012, Eromo emailed the defendant three Excel files that contained lists of mobile phone numbers that had been compiled by Paj and one of his colleagues, Jonathan Murad. (PSR ¶ 41; Tr. 436). Eromo also emailed the defendant instructions regarding how to use the lists of mobile phone numbers to autosubscribe without getting caught. (PSR ¶ 41).

On their face, the emails that Eromo sent to the defendant show that the defendant knew that he was engaging in autosubscribing from the very start – before the first consumer was billed through Bleam. First of all, all parties to the emails – Eromo, Paj, and the defendant – were using Gmail or Yahoo accounts, rather than their Mobile Messenger or Bleam accounts, suggesting that all parties to the emails knew that there was something untoward about the email contents. (PSR ¶ 43). Moreover, consistent with the trial testimony, the emails that Eromo sent the defendant gave instructions on how to autosubscribe without getting caught by Paj's analytical tests, like the pin to welcome time gap test and the conversion ratio test. As Paj explained at trial, these two tests were designed to detect autosubscribing by revealing abnormal time gaps between the consumers' receipt of the pin and welcome messages and abnormally high rates of conversion. (*See, e.g.,* Tr. 250). Here, in an email dated April 9, 2012, Paj laid out the "PIN 2 Welcome distrabuition [sic]" that he expected to see. (Ex. A; *see also* Tr. 253 (discussing the pin-welcome time gap analytic)). And, in an email dated the following day, Eromo explained to the defendant how to use the three Excel files that Paj had provided to achieve the appropriate conversion ratio. The email tells the defendant that one of the lists should receive "only pin messages," one should receive "pin messages, welcome, error code," and the third should receive "pin messages, welcome." (Ex. B). The email also instructs the defendant on the target "conversion ratio" for the numbers from the three Excel files. (Ex. B; *see also* Tr. 252 (discussing the conversion rate analytic)). If the defendant were engaged in legitimate business with Paj and Eromo, there would have been no need for the types of pin to welcome time gap and conversion rate manipulations suggested by these emails.

The defendant, Eromo, and Paj actively autosubscribed through Bleam for less than one month. (Tr. 1297-98). Almost immediately, Paj noticed red flags with the defendant's subscription data that might lead to an audit. On April 19, 2012, Paj emailed Eromo flagging numerous concerns, like "pin to welcome time gap is bad" and "conversion is 75." (Ex. C). Eromo forwarded the email to the defendant within three hours of receiving it. (Ex. C). Eromo also spoke to the defendant about the red flags raised in Paj's email, but the defendant was unable to correct the problems. As a result, Paj terminated his relationship with the defendant, and Bleam stopped autosubscribing consumers after a period of several weeks. (PSR ¶ 42; Tr. 437).

In June 2012, Mobile Messenger paid Bleam approximately $190,000 for its portion of the autosubscribing proceeds for May 2012. The defendant used $150,000 of that money to reimburse Paj and Eromo for the funds they had advanced to the defendant to create an autosubscribing platform at Bleam and to pay them their share of the autosubscribing proceeds. (PSR ¶ 43). In total, the defendant received over $600,000 in gross payments from Mobile Messenger, a significant portion of which came from autosubscribing proceeds and none of which the defendant would have received without his involvement in the autosubscribing scheme. (PSR ¶ 44).

### 2. The Charges, the Plea Agreement, and the Guidelines Calculation

On July 20, 2016, the defendant was charged in Counts One through Three of the above-referenced Indictment with: (1) participating in a conspiracy to commit wire fraud by auto-subscribing consumers, (2) wire fraud in connection with the auto-subscribing conspiracy, and (3) participating in a conspiracy to launder the auto-subscribing proceeds. (PSR ¶¶ 1-4). On February 7, 2017, the defendant pleaded guilty, pursuant to a plea agreement, to the conspiracy to commit wire fraud charged in Count One. (PSR ¶ 7).

The plea agreement between the defendant and the Government sets forth the calculation of the appropriate Guidelines Range under the United States Sentencing Guidelines. The parties agree that the base offense level is 7 and that the following enhancements and decreases are warranted: (1) a 14-level enhancement for a loss amount of between $550,00 and $1,500,000, (2) a 2-level enhancement because the offense involved ten or more victims, (3) a 2-level enhancement because the offense involved sophisticated means, (4) a 2-level decrease because the defendant was a minor participant in the criminal activity and (5) a 3-level decrease for acceptance of responsibility. (PSR ¶ 7). This leads to a total offense level of 20. (PSR ¶ 7). The parties also agree that the defendant has one criminal history point, which places him in Criminal History Category I, and that his Guidelines Range is 33 to 41 months' imprisonment. (PSR ¶ 7). The Probation Office calculated the same offense level, Criminal History Category, and Guidelines Range as that contained in the plea agreement. (PSR ¶¶ 62-83; PSR at 31).

Pursuant to the plea agreement, the defendant also admitted to the forfeiture allegation in the Indictment and agreed to forfeit $819,590.37. (PSR ¶ 7).

The Probation Office recommends a below-Guidelines sentence of 18 months' imprisonment. (PSR at 31). The defendant requests a non-incarceratory sentence. (Def. Sub. at 5). In the Government's view, a Guidelines range sentence of 33 to 41 months' imprisonment would be reasonable and appropriate.

**B.     Discussion**

    **1.     Applicable Law**

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in 18 U.S.C. § 3553(a)(2). To the extent a district court imposes a sentence outside the range recommended by the Guidelines, it must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50).

    **2.     A Sentence of 33 to 41 Months' Imprisonment Would Be Just and Appropriate**

In the Government's view, a Guidelines range sentence of 33 to 41 months' imprisonment would be a fair and appropriate sentence. In particular, the nature and circumstances of the offense, the need for just punishment, the history and characteristics of the defendant, the need to promote respect for the law, and the need for both specific and general deterrence all justify such a sentence.

The nature and circumstances of the offense are very serious. The defendant and his co-conspirators used stolen lists of hundreds of thousands of phone numbers to bill people without their authorization for services they did not want. The defendant and his co-conspirators participated in this fraud with the knowledge that it was designed to avoid detection by billing large numbers of people in small amounts that they were unlikely to complain about. This type of high-volume, low-dollar amount fraud is particularly dangerous to society because of the inherent difficulty in detecting and stopping it. That the defendant and his co-conspirators were attempting to use this type of fraud to raise money to engage in legitimate business is of no moment. There are many acceptable ways to raise money to start a business, but defrauding hundreds of thousands of people out of their hard-earned money is not one of them. The defendant and others like him need to be deterred from engaging in this type of fraud in the future, especially because they are unlikely to believe they will be caught.

Certainly, the defendant was not a high-level participant in this fraud. But, his role was essential because content provider partners were a necessary part of the autosubscribing scheme. The defendant's reduced role is also already accounted for by the two-level downward adjustment in the Guidelines Range, and should not be used to justify a below-Guidelines sentence.

The history and characteristics of the defendant also justify a significant sentence. This is not the defendant's first run-in with the law. He has a previous domestic violence conviction for a serious incident with his former girlfriend. The defendant is also someone who seems to show little remorse for his conduct. He attempts to justify his domestic violence conviction by blaming his girlfriend for being intoxicated. And, here, he attempts to justify has autosubscribing by conjuring up a story that he did not know it was autosubscribing from the beginning. But, the emails the defendant received and the testimony of Paj and Eromo, which was credible and cross-corroborating, tell a different story. From before the first consumer was autosubscribed and billed through Bleam, the defendant knew he was committing a fraud and that he and his co-conspirators were trying to cover up that fraud by manipulating data, like the pin to welcome time gap and the conversion rate. The defendant now argues that he tried to stop the autosubscribing at Bleam as soon as he learned about it. But, if that were true, there would never have been any fraud associated with Bleam in the first place. The defendant knew he was autosubscribing. He had the power to stop it before it started and chose not to. His arguments to the contrary should not be used to justify his receipt of a shorter sentence. If anything, the defendant's arguments suggest that the three points for acceptance of responsibility that he received are generous.

The defendant does have many positive characteristics that other defendants do not. He is well-educated, has a history of employment and of running his own businesses, has no addiction issues, and has the support of family members and friends. But, in spite of all of those advantages, the defendant chose to engage in a massive fraud designed to steal from others $10 at a time. The defendant did not need to do that to feed his family or to put a roof over his head. But, he chose to do it, nonetheless. The defendant's sentence should reflect that he needlessly chose to engage in crime, despite all the resources he had at his disposal.

In light of the nature and seriousness of the offense, the defendant's continued refusal to accept responsibility for his actions, and the needlessness of the defendant's decision to engage in this conduct, a Guidelines range sentence of 33 to 41 months' imprisonment would be sufficient but not greater than necessary to satisfy the goals of sentencing.

### 3. The Defendant Should Be Ordered to Forfeit $600,000, and the Government Requests 90 Days to Submit a Restitution Order.

Bleam only became a content provider at Mobile Messenger because of Eromo and Paj's offer to the defendant that he could engage in autosubscribing with them. As a result, all of Bleam's income as a content provider, which amounts to more than $600,000, is inextricably linked with autosubscribing. As a result, the defendant should be ordered to forfeit $600,000.

While the defendant correctly points out that a change in law subsequent to the plea agreement alters the forfeiture amount by eliminating joint and several liability, the defendant is still appropriately accountable for all of the proceeds that flowed to him, regardless of what he chose to do with those proceeds thereafter. The fact that the defendant paid Eromo and Paj out of those proceeds was his choice. That choice does not alter the forfeiture amount. *See, e.g.*, *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (18 U.S.C. § 981(a)(1)(C) authorizes the forfeiture of any property which constitutes or is derived from proceeds traceable to the offense, whether kept by the defendant or shared with others); *United States v. Uddin*, 551 F.3d 176, 181

(2d Cir. 2009) (order to forfeit all the money paid into the defendant's bank account from the fraud was reasonable, regardless of whether the defendant shared that money with a co-conspirator).

With respect to restitution, the Government requests 90 days in which to submit a restitution order.

**C.    Conclusion**

For the reasons set forth above, a Guidelines range sentence of 33 to 41 months' imprisonment would be fair and appropriate in this case.

        Respectfully submitted,

        JOON H. KIM
        Acting United States Attorney

By:    /s/ Jennifer L. Beidel
        Sarah Paul
        Richard Cooper
        Jennifer L. Beidel
        Assistant United States Attorneys
        (212) 637-2326/1027/2212

cc:    Reuven L. Cohen, Esq.
        Jennifer L. Williams, Esq.