# SERCARZ & RIOPELLE, LLP

810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019
(212) 586-4900
FACSIMILE (212) 586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

ROBERT CALIENDO
GIULIANA E. GRAHAM

*ADMITTED IN NY & NJ

November 10, 2017

*BY ECF*

Hon. Katherine B. Forrest, U.S.D.J.
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:   *U.S. v. Darcy Wedd, et. al., 15 CR 616*

Your Honor:

We write in response to the Government's motions *in limine*, filed in anticipation of the third trial of the above referenced Indictment. ECF No. 568.

At this stage, the Court is fully familiar with the underlying facts. Accordingly, we will limit ourselves to those details necessary to advance our arguments:

## I.   The Government's Evidence Regarding The "Content Provider Scheme" Should Be Limited To Preclude Reference To "Deceptive" Or "Non-Compliant" Marketing

We do not quarrel with the proposition that evidence regarding the flow of money from the Content Providers to the defendant is inextricably intertwined with the allegations relating to the money laundering charges.  However, the evidence should be limited to testimony and documents demonstrating (1) that Mr. Wedd, along with his co-conspirators, maintained a controlling interest in certain Content Providers; (2) that

Wedd and his co-conspirators sought to hide their concealed interest from executives of Mobile Messenger; (3) that meetings were held at which the management of these Content Providers was discussed; and (4) the flow of money from the carriers to Mobile Messenger, to the Content Providers and then, to the defendant and his alleged co-conspirators.

In our own motions *in limine*, we have sought to preclude evidence of non-compliant marketing – both among these Content Providers and among other content providers who operated on the Mobile Messenger Full Service and Aggregation platforms. As we set out in our application, evidence that Content Providers engaged in non-compliant marketing will only serve to distract the jury from the issues at this trial. Moreover, no evidence was introduced at either of the preceding trials to indicate that the defendant approved of the advertising content or the content of Mobile Messenger's website. The allegation that the defendant was willing to participate in a "deceptive marketing scheme" lacks probative value, and carries a substantial risk of prejudice.

## II.   The Government Should Be Precluded From Offering Evidence Regarding The Washington Attorney General Action Against Tatto Media[1]

While the Government has "checked off the box" indicating that such evidence is proof of the "relationship of trust" between Mr. Wedd and Lin Miao, this Court, having presided over two trials, now knows better.

To review, the Washington Attorney General action took place in 2009, more than two years prior to commencement of the auto-subscribing scheme alleged in the Indictment. The allegations involved business practices of Tatto Media that had no relationship to the auto-subscribing alleged in this Indictment. The assistance provided by Mr. Wedd was limited to referring Lin Miao to Mobile Messenger's inside counsel, Alan Sege, who then represented Tatto in the lawsuit. And, there was no suggestion that Mr. Wedd knew about, or participated in, Mr. Miao's subsequent violation of the settlement agreement negotiated by Sege.

The Court is well aware that when Lin Miao ("Miao") embarked upon his scheme to auto-subscribe in 2011, he did so with individuals other that Mr. Wedd. Miao went to Aly Giovani for phone numbers. (TR1-227.) He went to Michael Pearce at BullRoarer for technical information about the process of "spoofing" the double opt-

---

[1] For the reasons set forth herein, the Government should also be precluded from offering evidence that, early in their relationship, Wedd paid for a prostitute, and provided "party favors" for Miao.

in verification. (TR1-232.) He then used in-house technical help at Tatto to replicate the process.  And, when he needed additional phone numbers for the purpose of auto-subscription he "incentivized" his account manager at Mobile Messenger, Christopher Goff. (TR1-529.)

Miao did not even broach the subject of auto-subscribing with Darcy Wedd until (1) Mr. Wedd caught him auto-subscribing during an audit of suspicious activity conducted by Mobile Messenger at Wedd's request; and (2) Wedd placed a halt on new subscriber activity on the offending short code until issues regarding Tatto's methods could be resolved.  *See* GX-279.

Under these circumstances, the suggestion that Miao relied upon a relationship of trust formed with Mr. Wedd during the Washington Attorney General litigation, two years earlier, rings hollow.  At best, such evidence is of limited probative value. Meanwhile, the jury will be invited to infer that, because Wedd provided limited assistance to Tatto in response to a regulatory action, he was a willing participant in the auto-subscribing activity that took place at the end of 2011.  This is precisely the inference of Mr. Wedd's propensity to engage in unlawful conduct that is forbidden by the cases.

Accordingly, this evidence should be precluded.

III.    **The Defense Will Confine Any New Evidence Introduced At Trial To Those Areas Already Permitted By The Court, And Evidence That From 2006 To 2009, Mobile Messenger Was Acting As A Content Provider**

The Government has flagged for the Court its intention to object to evidence of "otherwise lawful activity" that Wedd engaged in at Mobile Messenger, other than the evidence admitted pursuant to the "carefully drawn limits" of prior trials.

In accordance with the Court's rulings at those trials, any new evidence will be limited, with one exception, either to the argument (a) that Wedd lacked the intent to commit the crimes charged, and promoted initiatives calculated to end auto-subscribing, due to a concern that auto-subscribing would result in the termination of "short codes" ( the intent argument); or (b) that Wedd's travel and work on other projects demonstrate that he was not focused on whether his subordinates were committing fraud together with the Content Providers (the "non-conscious avoidance" argument).

The defendant testified at both of the prior trials.  In each instance, he was cross-examined regarding his involvement in concealing from Mobile Messenger the fact that

3

he and others had a concealed interest in a group of Content Providers. (TR2-2339). Among the lines of attack, the Government suggested that this practice represented a clear conflict of interest. (TR2-2339-2340). In order to place Wedd's decision in context, the defense should be permitted to elicit testimony and introduce a limited amount of documentary evidence to establish that from 2006 to 2009 Mobile Messenger was, itself, functioning as a Content Provider.

### IV.   At Trial, We Will Object To A Conscious Avoidance Instruction

We respectfully submit that there was no factual basis for a conscious avoidance charge at the first two trials; and, that barring a material change in the proof, it would be error to instruct the jury on conscious avoidance at the upcoming trial.

The Government offered testimony by three cooperating witnesses, each of whom testified that Mr. Wedd was a knowing participant in the auto-subscribing schemes charged in the Indictment. Mr. Wedd has testified at both prior trials that he had no knowledge that other Mobile Messenger employees were involved in auto-subscribing. The issue of the defendant's actual knowledge was, thus, fully joined. The Government failed to point to any facts from which one could infer that the defendant deliberately sought to close his eyes to evidence that Content Providers were engaging in fraud. In discussing conscious avoidance, Mr. Paul relied upon the following:

> […] [A]nd here, even if you credited Wedd's testimony, it would be charitable to Wedd to say he remained willfully and intentionally ignorant of the fact that Tatto was auto-subscribing.
>
> They got caught doing it in September 2011. They told Wedd that they were auto-subscribing and they wanted his help. After that they continued doing it. And in his role at Mobile Messenger, he assisted them. To now claim that he did not know is to turn the facts on their head.
>
> Ladies and gentlemen, based just on what Wedd told you, even if you were to credit it, he's guilty under a conscious avoidance theory.

(TR2-2629).

To the contrary, the import of Mr. Wedd's testimony was that after confronting Miao with evidence that he had engaged in auto-subscribing, Miao agreed to desist from this practice. Not content with Miao's assurances, Wedd inquired regarding the date of Tatto's next regularly scheduled audit, and requested that he be advised of any further

anomalous activity. No negative results were forwarded to him. (TR2-2261-2263) This is a far cry from evidence that Wedd, confronted with the overwhelming likelihood that Miao would continue to auto-subscribe, closed his eyes to the likelihood that this unlawful activity would continue.

Meanwhile, there is every danger that if the Government is permitted to offer evidence of a variety of unlawful activities at Mobile Messenger, and the amount of the loss due to auto-subscribing is calculated by the Government to be in the tens of millions of dollars, a jury will convict solely because of the defendant's position as the Chief Operating Officer of the company. The use of a conscious avoidance charge in this case will, in all likelihood, serve as a pretext for precisely this kind of unfounded verdict.

## V.      The Court Should Give The Following Limiting Instructions

The Court should give its proposed limiting instruction regarding cooperator guilty pleas. ECF No. 299, p. 2.

In the event that the Court permits the introduction of testimony regarding non-compliant or deceptive marketing, the Court should give its limiting instruction regarding non-compliant marketing. ECF No. 299, p. 3.

The Court should give its proposed limiting instruction regarding Wedd's involvement with the Executive Group of Content Providers. ECF No. 484, p. 4. This instruction should be modified to omit reference to co-defendant Thompson. The proposed instruction also contains a typo, and should be modified to say that Wedd is "not" on trial for any illegality relating to those companies, beyond the charged conspiracy. *Id.*

Wedd objects to Miao's testimony about drugs and prostitutes because it is unfairly prejudicial, and lacks sufficient probative value. The testimony distracted from the genuine issues of fact to be determined, and was incredible on its face. If admitted over objection, the Court should give its proposed limiting instruction regarding that testimony. ECF No. 484, p. 5.

Wedd objects to testimony concerning his alleged conduct in 2007 in Australia. It exceeds the scope of the charged conspiracy, is prejudicial, and lacks probative value. If admitted over objection, the Court should give its proposed limiting instruction regarding allegations about Wedd in 2007 in Australia. ECF No. 299, p. 6.

Wedd objects to witness testimony concerning uncharged instances of auto-subscribing. If admitted over objection, the Court should give its proposed limiting instructions regarding uncharged instances of auto-subscribing. ECF No. 299, p. 7; ECF No. 484, p. 9.

Most respectfully,

/s/

Maurice H. Sercarz

cc:      All Parties (by ECF)